# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| THOMAS AIKENS, individually, and on behalf of all others similarly situated, ) ) ) | Case No. 4:10-CV-00875 |
| Plaintiff, ) ) | |
| v. ) ) | Hon. Howard F. Sachs |
| ) | |
| PACIFIC WEBWORKS, INC., a Nevada ) corporation, and INTERMARK ) COMMUNICATIONS, INC., a New York ) corporation, ) | **PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| ) | |
| Defendants. ) ) | |
| ——————————————— ) ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Thomas Aikens bring this First Amended Class Action Complaint against Defendants Pacific WebWorks, Inc. ("Pacific WebWorks") and Intermark Communications, Inc. ("Intermark") (hereinafter collectively referred to as "Defendants") based upon Defendants' practice of deceptively marketing to and billing Plaintiff and similarly-situated others for unauthorized charges. Plaintiff, for his First Amended Class Action Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his own attorneys.

### Parties

1.    Plaintiff Thomas Aiken is a natural person and citizen of the State of Missouri.

2.    Defendant Pacific WebWorks is an online provider of work-at-home products marketed to consumers nationwide. Pacific WebWorks is a Nevada corporation headquartered

in and having its principal place of business at 230 West 400 South, 1st Floor, Salt Lake City, Utah 84101. It does business in the State of Missouri and nationwide.

3. Defendant Intermark Communications, Inc. is an ad network generating online advertisements, consumer traffic for websites selling products and goods, and conversion optimization for those websites. Intermark also performs as an affiliate marketer in this online space. Intermark is headquartered in and has its principal place of business at 135 Crossways Park Drive, Suite 203, Woodbury, New York 11797. It does business in the State of Illinois and nationwide.

## Jurisdiction and Venue

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

5. Venue is proper in this District under 28 U.S.C. § 1391(a) as the injury arose in this District. Venue is additionally proper because Defendants transact significant business in this District, including soliciting consumer business, and entering into consumer transactions.

## Facts Common to All Counts

6. With unemployment rising and wages stagnant, Americans are suffering through the worst economy in decades. In these hard times, ordinary consumers are more than ever subjected to a proliferation of work-at-home offers that promise the ability to easily make thousands of dollars from at-home businesses.

7. The offers hosted by Pacific WebWorks, and marketed by Intermark, state that consumers will work directly with and be well-paid by the giant web search engine Google. The

2

ability to work for this enormously successful company reasonably supports the promise of good income described in the offers from Defendants.

8.    Defendants' offers begin as initial representations made through a common deceptive scheme managed collaboratively by Pacific WebWorks and Intermark, consisting of spam email offers, sponsored links, banner ads on internet search pages, and links in fake news articles and fake blogs. The purpose of each of these initial representations is to drive consumer traffic to credit card submit landing pages at which a purchase can be made.

9.    These sponsored links, banner ads, fake news articles, and similar methods of gaining a consumer's attention are created and operated by a group of affiliate marketers and ad networks, such as Intermark. These parties' sole objective is to drive traffic to merchant landing pages, such as the pages that sell Pacific WebWorks' products. Intermark, acting as an ad network and/or affiliate marketer, actively drives traffic to Pacific WebWorks' website for its own monetary gain. The relationship between Pacific WebWorks on the one hand, and Intermark on the other, is one of interdependence: Pacific WebWorks needs Intermark or other ad networks, to market to and contract with affiliate publishers, who then further propagate the deception through fake news articles and blogs; likewise, Intermark needs Pacific WebWorks to monetize the consumer traffic through purchases and thereafter remit payment to the ad networks.

10.    Defendants Pacific WebWorks and Intermark work together to "optimize" transaction pages so as to drive ever-higher rates of purchase. Both Defendants are motivated to take this active role because the sales revenue generated on a Pacific WebWorks site is the sole means by which Pacific WebWorks and Intermark are compensated. Therefore, Intermark has a vested interest in not only directing consumers to the product page, but also in actively ensuring

that a consumer purchases the product. This optimization can include changing the design of ad

pages in the order path including the color, words used, placement of words, font size, placement

of the Terms of Service, and the use of "pressures" like "You Qualify for Instant Access!" and

"…these kits are going FAST!," or the use of running timers counting down the minutes left

before an offer "expires." Such pressures are simply fabrications and are dynamically inserted

into the website at specified screen locations to further drive sales.

      11.     Intermark employs "affiliate managers" and other representative employees to

communicate directly with the affiliate publishers who create deceptive advertising such as

sponsored links and fake news articles and blogs, with the purpose of matching them with the

highest converting merchant offers (usually the most deceptive), and help them optimize their

advertising materials by providing templates and ad copy. At the same time, Intermark

employees communicate with merchants like Pacific WebWorks so as to match their transaction

pages with publishers' advertising pages and optimize their own transaction pages for higher

conversion rates (making them more deceptive). These affiliate managers have full visibility and

knowledge of the deceptive advertisements used to drive traffic to work-at-home offers, and

likewise, the full knowledge and visibility of the deceptive nature of merchants' transaction

pages.

      12.     As a primary inducement, consumers are often simply responding to the many

initial representations and screenshots that appear to state a relationship with Google itself within

order paths managed by Intermark. The use of Google's name in this manner, and specifically

the prospect of working for one of the world's most successful companies, appears as a primary

non-price inducement to deceptively entice consumers to purchase the Pacific WebWorks

product.

13.     After consumers are directed by Intermark to a Pacific WebWorks landing page displaying a work-at-home offer, Pacific WebWorks pushes a product, often a CD or software kit, purportedly designed to enable consumers to "Earn up to $978 or more a day using GOOGLE" or "Work from Home & learn to make $1000s a day using GOOGLE!," and/or to fulfill the claim that "Anyone with a computer and basic typing skills can make money using Google!" (*See* Exhibit B).

14.     These landing pages typically contain language describing their offering: "As seen on: Fox News, CNN," and "USAToday." The pages prominently feature network logos without license from these media entities and are plainly designed to suggest to a consumer that the offering is supported by a reputable entity. Pacific WebWorks products have never been "seen on" or endorsed by any of the networks claimed on the website.

15.     The initial landing page seen by a consumer is bright and welcoming, and promises "FAST CASH USING GOOGLE" and "HOME INCOME USING GOOGLE," among other pleasing inducements. Representations that drive consumers to these landing pages within the order paths managed by Intermark promise "$7500 a month Working from Home Job: requires basic computer skills." Banner ads even promise "scam free" offers that link to landing pages created by Intermark's business partners, on which consumers are then promised Pacific WebWorks' products at prices that are not, in fact, remotely close to the actual price charged by Pacific WebWorks.

16.     Pacific WebWorks' landing pages contain a testimonial photo of a consumer that benefited from Pacific WebWorks' product. In fact, this photo is a fake, inasmuch as Pacific WebWorks simply uses a stock photo (commonly available at websites like iStockPhoto.com) and fabricates the testimonial.

5

17.    In furtherance of the deception, Pacific WebWorks' landing pages may be reached from embedded links in fake blog testimonials ("flogs") and fake news articles with, again, stock photos and testimonials purportedly representing actual consumers from one's own city or state. (*See* Exhibit A). These consumers relate stories of terrific success using the Pacific WebWorks product. Examples of these flogs and fake news articles deceptively used to sell Pacific WebWorks' products are:

a.    "USA Online Journal-Finance News" in which "Mary Steadman"[1] tells how she "quit her boring job as a manufacturer's representative" and "now makes $6,500+ a month" using Pacific WebWorks products.

b.    "Consumer Weekly," which utilizes the same photo of the woman claiming to be "Mary Steadman" above, but in this instance she has the name "Elaine Love," who also lost her "boring" manufacturing job and now makes thousands using Pacific WebWorks products.

c.    "Chicago Job News" at which "Jerry Reynolds" describes how he "lost his boring job as an account representative for a manufacturing company" and "now makes $5,500+ a month just by submitting small text ads online on Google."

---

[1] "Mary Steadman," the most widely used fake person in fake news articles selling work-at-home products, is also featured on the following fake news sites, and at least 90 more websites all across the internet:

www.SanFrancisco-Tribune.com, www.SanFranCiscoCityHearld.com, www.Sandiego-Tribune-News.com, www.SanDiego-Tribune.com, www.SanJose-Herald.com, www.SanJose-Times.com, www.TheLosAngelesJournal.com, www.LosAngelesTribuneNews, www.LosAngelesNews7.com, www.LosAngelesFinanceNews.com, www.Los-Angeles-Weekly.com, www.LosAngelesDispatch.com, www.4KAWeekIn3Steps.com, www.Action7Journal.com, www.AmericaFinanceNews.com, www.AmericaJobJourna.com, www.AmericaNewsDaily.com, www.B12-Media.com, www.BargainBoomer.com, www.Best-Job-In.com, www.BirmingHamTribune.co.uk, www.Boston-BusinessNews.com, www.Boston-Tribune.com, www.BostonFinanceNews.com, www.BostonGazetteNews.com, www.OrlandoWebTimes.com, www.ReadSomeNews.com, www.Online-Job-News.com, www.NYGazetteNews.com, www.NewYorkPostHearld.com,www.NewYorkPostHeard.com.

d.      "Scott Hunter" on "wthguide.info," a fake blog that states how Mr. Hunter also "lost his job as a boring account representative for a manufacturing company." "Scott' makes "$9,000+ a month just by submitting small text ads on Google." Upon information and belief, "Scott Hunter" is the pseudonym of an affiliate marketer driving traffic to a Pacific WebWorks site.

18.      Pacific WebWorks also derives sales from online traffic routed through fake consumer review sites. At these sites, alleged consumer "advocates" endorse Pacific WebWorks' products with laudatory language and links within the body of these fake reviews connect to deceptive transaction pages for those products. (*See* Exhibit A). Intermark provides the necessary conduit between the publishers of fake advertising materials and Pacific WebWorks by contracting with both parties to drive deceived consumers from the initial misrepresentations to a credit card submit page.

19.      The online order paths leading to Pacific WebWorks' transaction pages are littered with pictures of individuals that testify to the success they have enjoyed using Pacific WebWorks' product. The individuals in Pacific WebWorks' fake photos are not from the consumer's city or state; in fact, the specific locale represented is dynamically generated by instructions contained in the underlying source code for the screen page presented. That is, "Sara Stanley" from "Chicago" is in fact simply a fictitious person whose city name is generated by source code that recognizes and responds to the (Chicago) IP address of the consumer's computer.

20.      A consumer is required to give Pacific WebWorks certain "personally identifying information" (PII) to "CHECK AVAILABILITY" of this "LIMITED TIME OFFER!" (*See* Exhibit B). A consumer's submission of her PII enables Pacific WebWorks to sell this

information to other marketers of goods and products. Thus, a consumer actually does not have to "qualify" for anything. Rather, the consumer submits to a lead generation process through which (1) her PII (a "lead") is monetized by Pacific WebWorks and (2) the consumer unknowingly "consents" to the receipt of additional email offers from an untold number of merchants, *i.e.*, anyone to whom Pacific WebWorks can sell this information.

21.     The product offered by Pacific WebWorks is promised at the minimal price of $2.00 or less, which is represented as covering all costs of the product.

22.     Importantly, in order to cover this small charge, Pacific WebWorks requires that consumers provide a credit card number.

23.     A consumer's credit card number is entered into a credit card submit field on an online transaction page. (The transaction page most often directly follows the landing page. The order path may be understood as starting with the initial representation that drives traffic to the landing path where a consumer's PII is taken. A billing or transaction page completes the online order path.) (*See* Exhibit C).

24.     Materially, the only price representation clearly and conspicuously displayed on the credit card submit page or in proximity to the credit card submit box is a line that states "**Total: $1.97.**"

25.     Calls to action like "<u>LIMITED TIME OFFER</u>!" and "WORK FROM HOME, SET YOUR OWN HOURS, THEN LIVE YOUR LIFE!" are found on these pages. These phrases are part of a static background image that are saved and displayed every time the page loads on a consumer's browser.

26.     Compelling phrases including "Satisfaction Guaranteed" and "100% Trusted!" appear in large print scattered about the page.

8

y

information to other marketers of goods and products. Thus, a consumer actually does not have to "qualify" for anything. Rather, the consumer submits to a lead generation process through which (1) her PII (a "lead") is monetized by Pacific WebWorks and (2) the consumer unknowingly "consents" to the receipt of additional email offers from an untold number of merchants, *i.e.*, anyone to whom Pacific WebWorks can sell this information.

21.     The product offered by Pacific WebWorks is promised at the minimal price of $2.00 or less, which is represented as covering all costs of the product.

22.     Importantly, in order to cover this small charge, Pacific WebWorks requires that consumers provide a credit card number.

23.     A consumer's credit card number is entered into a credit card submit field on an online transaction page. (The transaction page most often directly follows the landing page. The order path may be understood as starting with the initial representation that drives traffic to the landing path where a consumer's PII is taken. A billing or transaction page completes the online order path.) (*See* Exhibit C).

24.     Materially, the only price representation clearly and conspicuously displayed on the credit card submit page or in proximity to the credit card submit box is a line that states "**Total: $1.97.**"

25.     Calls to action like "<u>LIMITED TIME OFFER</u>!" and "WORK FROM HOME, SET YOUR OWN HOURS, THEN LIVE YOUR LIFE!" are found on these pages. These phrases are part of a static background image that are saved and displayed every time the page loads on a consumer's browser.

26.     Compelling phrases including "Satisfaction Guaranteed" and "100% Trusted!" appear in large print scattered about the page.

8

27.     Ultimately, a consumer reasonably understands that ordering the Pacific WebWorks product is an action that will cause her to incur a small charge on her credit card. In fact, this small price is simply bait to obtain a credit card number that can then be used to impose additional charges on the consumer.

28.     Though the actual price of a product is always material, in cooperating with each other, Pacific WebWorks and Intermark hide the real price of their product in small print on or under the transaction page or simply do not disclose it at all on the checkout page.

29.     By simply submitting credit card information to Pacific WebWorks in payment of the discounted fee of $1.97 (Pacific WebWorks also offers identical products at $.97, $1.95, and $2.95), a consumer unwittingly agrees to a monthly recurring charge of $79.90 (also, in some instances, $69.90) for access to a program purportedly containing information that enables a consumer to "Start Making Money Today!"

30.     Materially, and wholly absent any clear and conspicuous price disclosure, consumers may also find that they have been billed $24.90 by Pacific WebWorks for another, unknown product. This charge is recurring in that it appears every month on a consumer's bill. This undisclosed negative option, deceptively tied to a consumer's agreement to pay a small amount for a Pacific WebWorks product, is charged to consumers entirely without their authorization.

31.     Thus, a consumer reasonably expecting to pay $1.97 for a Pacific WebWorks product will be charged that sum plus: 1) $79.90, and 2) $24.90 a month for as long as the consumer fails to notice this charge and object to it.

32.     Only the charge of $1.97 is clearly and conspicuously disclosed by Pacific WebWorks or Intermark to a consumer responding to a work-at-home offer.

33.     Pacific WebWorks acts with Intermark to drive traffic to, promote, and sell its work-at-home product. Correspondingly, both Defendants optimize and continually oversee the creation of the deceptive advertisements concealing material terms and conditions, described herein, and both Defendants receive significant revenue from the sale of each poorly-disclosed Pacific WebWorks product.

34.     Defendants know or should know that these ads and offers violate clearly established laws requiring, among other seminal concerns, that all material purchase terms be clearly and conspicuously disclosed to consumers.

35.     Although Defendants use a number of specific paths and representations for their deception, each order path has a core, common underpinning: namely, that a consumer will only be charged $1.97 for a work at home product sold by or directly associated with Google.

### Facts Relating to the Plaintiff Thomas Aikens

36.     In or around October 5, 2009, Plaintiff Thomas Aikens, an elderly, retired, United States Navy veteran living off Social Security, clicked on an advertisement located in an email solicitation while at his home computer. The link, which offered a work-at-home opportunity, was placed there by an affiliate publisher of Intermark or Intermark itself. That link led to a webpage, also hosted by Intermark's affiliate publisher, where Plaintiff read advertisements and testimonials supporting the product. This site contained a link to Intermark's server, which instantaneously routed Plaintiff to a specific landing page operated by Pacific WebWorks, nearly identical in form and substance to the pages described above.

37.     The price terms, including the total cost, the negative option nature of the enrollment, and the reoccurring nature of the charges was not clearly disclosed by Pacific WebWorks or Intermark on the publisher's advertisement pages or on Pacific WebWorks

landing pages. Rather, the price terms were hidden at the bottom of the page, "below the fold" (which requires a person to scroll down to see the remainder of the page), and in an indistinct font color and minuscule font size, making it burdensome for Plaintiff or any reasonable person to see or understand the terms.

38.     The deception perpetrated by Pacific WebWorks and Intermark on Plaintiff is only compounded by that the fact that Defendants clearly disclosed to Plaintiff a price term of $1.97, and represented to him that this was the total cost of the product. On those grounds, Plaintiff reasonably understood that he could receive the work at home product (online bizkit) for only $1.97. Defendant did not reasonably inform Plaintiff, or give him clear notice, that by agreeing to pay Defendants $1.97 Plaintiff had also "consented" to be billed $79.90 on a monthly basis or of the negative option nature of the enrollment.

39.     Pacific WebWorks and Intermark represented to Plaintiff that various media outlets, newspapers, and internet companies endorsed their work-at-home product. Plaintiff did not know that the represented media outlets themselves had nothing to do with this product. Further, Plaintiff did not know that the testimonials appearing on Intermark's publisher pages, and on the Pacific WebWorks landing page, were false. Plaintiff reasonably relied on these misrepresentations when making his purchase, and his reliance was justified because a reasonable person would have been deceived by Defendants' comprehensive marketing scheme and intentional misrepresentation and concealment of the actual amount that a person will be charged.

40.     From the first moment that Plaintiff clicked on the email solicitation to the time he finished his transaction, Plaintiff passed through a series of cryptic and indecipherable website

11

addresses (operated by Intermark's publisher, Intermark, and Pacific WebWorks) substantially similar to the following:

http://new-york-gazette.com?t202id=2797107&t202kw=Time.com+US+%26+World+Section

http://redirect.tracking202.com/off/3269742/1692561261

http://redirect.tracking202.com/cl2?q=http%3A%2F%2Fwww.cpaclicks.com%2?sec ure.asp%3Fe%3Dckelkxpxlkze%26d%3D0%26l%3D0%26p%3D0%26subID1%3D %26o%3D169256126

http://www.cpaclicks.com/w3c/p3p.xml

http://affiliates.copeac.com/ez/ckelkxpxlkze/

https://secure.on1inetrack.com/?offer=go_qg_cov4&cp=12816&id1=&id2=1692561 26

https://secure3.on1inetrack.com/goph/?offer=go_qg_cov4&cp=12816&id1=&id2=1 69256126&session-id=072f32f0eee94cef026f9495a472b7db

    41.    Defendants placed "cookies," or files used for tracking purposes, on Plaintiff's computer substantially similar to the following:

directtrack_click_intermarkmedia=d95305cea53d798a0f0de94a143aa3f6

tracking202subid=69256126

session-id=072f32f0eee94cef026f9495a472b7db

token=LDMQjeSVRWub%2FH9qtrSrbMCfjc9ofn2FgPMw5ZaFrpI%3D

    42.    Plaintiff only authorized Defendant to bill his debit card the charge of $ .97. Nevertheless, and without any authorization from Plaintiff, Pacific WebWorks took from Plaintiff an additional $79.90. Pacific WebWorks thereafter remitted a portion of that payment to Intermark for its role in obtaining Plaintiff's unauthorized payment.

43.     Plaintiff called the toll free number repeatedly to request a refund. Plaintiff finally spoke with a representative who Plaintiff informed that he (1) never authorized Pacific WebWorks to bill his card the sum of $79.90, (2) never received a work-at-home kit, and (3) wanted to cancel his order and receive a refund of the unauthorized charge of $79.90.

44.     Plaintiff told the Pacific WebWorks representative that he would not have agreed to pay $79.90 for this product if he had been clearly informed that this was the actual price for the product offered. The Pacific WebWorks representative simply told Plaintiff that he "should have read the fine print." The representative then gave Plaintiff a cancellation number and informed him that that charge would be removed. Nevertheless, the charge remained on Plaintiff's account.

45.     On information and belief, the exact landing pages viewed by Plaintiff are known to and in the sole possession of Pacific WebWorks.

46.     On information and belief, the exact email, marketing materials, and websites viewed by Plaintiff prior to being directed to a Pacific WebWorks landing page are known to and in the possession of Intermark.

47.     To date, Plaintiff has *not* received a refund from Pacific WebWorks.

**Class Allegations**

48.     Plaintiff brings this action pursuant to Rule 23 on behalf of himself, a Class, and one SubClass:

**Pacific WebWorks Class:** Plaintiff brings this action on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All Missouri residents who submitted payment information to Pacific WebWorks for the purpose of obtaining Pacific WebWorks' products or services, and who were charged any amount other than a stated shipping and handling or discounted fee.

**Intermark SubClass:** Plaintiff brings this action on behalf of himself and a SubClass of similarly situated individuals, defined as follows:

> All Missouri residents who submitted credit card information to a Pacific WebWorks website for the purpose of obtaining Pacific WebWorks' products or services, who were charged any amount other than a stated shipping and handling or discounted fee, and that were traceably driven to a Pacific WebWorks' website(s) by Intermark Communications, Inc., or affiliate marketers acting through or in conjunction with Intermark Communications, Inc.

Hereinafter, the above-described Class and SubClass may be stated as "Class" for purposes of this First Amended Complaint.

The following people are excluded from the Class and SubClass: 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; and 3) persons who properly execute and file a timely request for exclusion from the class and 4) the legal representatives, successors or assigns of any such excluded persons.

49.     **Numerosity:** The exact number of the members of the Class is unknown and not available to Plaintiff, but it is clear that individual joinder is impracticable. On information and belief, Defendants have deceived thousands of consumers who fall into the definition set forth in the Class. Members of the Class and SubClass can be identified through Defendants' records.

50.     **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendant, based upon the same transactions that were made uniformly to Plaintiff and the public.

51.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in

complex class actions. Plaintiff has no interest antagonistic to those of the Class and SubClass, and Defendants have no defenses unique to Plaintiff.

52.  **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by the individual members of the Class and SubClass will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant. It would be virtually impossible for the individual members of the Class and SubClass to obtain effective relief from the misconduct of Defendant. Even if members of the Class and SubClass themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this First Amended Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

53.  **Commonality:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to the following:

> (a)  Whether Defendants' conduct described herein violates the Missouri Merchandising Practices Act (Mo. Ann. Stat. § 407.020 (West));
>
> (b)  Whether Defendants' conduct described herein constitutes Fraud in

the Inducement;

      (c)     Whether Defendants' conduct described herein constitute ;

Conspiracy to Commit Fraud in the Inducement;

      (d)     Whether Defendant Pacific WebWorks's conduct describ :d herein

results in a breach of contract; and

      (e)     Whether Defendants' conduct described herein results in unjust

enrichment to Defendants.

<u>COUNT I</u>
**Violation of the Missouri Merchandising Practices Act**
**(Mo. Ann. Stat. § 407.020)**
**(On Behalf of Plaintiff and the Class)**

54.    Plaintiff incorporates by reference the foregoing allegations.

55.    The Missouri Merchandising Practices Act ("MMPA") (Mo. Ann. Stat. ;

407.020) protects both consumers and competitors by promoting fair competition in co nmercial

markets for goods and services.

56.    The MMPA prohibits any unlawful, unfair or fraudulent business acts o  practices

including the employment of any deception, fraud, false pretense, false promise,

misrepresentation, or the concealment, suppression, or omission of any material fact.

57.    As described within, Defendants' continued utilization of unlawful and

unconscionable marketing practices, and the continuing practice of charging consumer : credit

cards without authorization, constitutes a deceptive act or practice by Defendants in vic lation of

the MMPA.

58.    Defendants made false statements, representations, and material omissic ns to

Plaintiff and the Class, including but not limited to, the actual price of the product, the negative

option nature of the charges, the reoccurring nature of the charges, false representation ; of

Defendants' association with Google, including the use of Google's trademarked logo without permission, fake testimonials attesting to the efficacy of the product, fabricated recommendations and reviews through fake news stories and fake blogs, the limited availability of their products in terms of both time to purchase and quantity, the need to "qualify" in order to purchase their product, false statement of earning potential, including variation in amount that can be made in a day ($209-$909, $978, $500, $560 $379, $933), and the false representation that their product is endorsed by television networks, newspapers, or internet websites, including the use of company logos without permission.

59.     Defendants engaged in deceptive trade practices in violation of the MMPA when they deceived Plaintiff and the Class by creating and supporting advertising that fails to clearly and conspicuously disclose the actual price of their products and induced Plaintiff and he Class to proffer payment information based on that misrepresentation.

60.     The price of a consumer product is a material term of any transaction because it is likely to affect a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception related to the price of a consumer product is materially misleading.

61.     Defendants' misrepresentation of the price, in all phases of the marketing and sale of work-at-home products, is likely to mislead a reasonable consumer who is acting reasonably under the circumstances.

62.     Defendants violated the "unfair" prong of the MMPA when they caused substantial injury to consumers by charging consumers' credit cards without their consent after inducing them to submit their payment information through deceptive marketing. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

63.     Defendants violated the "fraudulent" prong of the MMPA because their statements, advertisements, and representations regarding what consumers would be charged for its products are patently false and likely to deceive a reasonable consumer.

64.     Defendants intended that Plaintiff and the Class rely on Defendants' material misrepresentations and deception because Plaintiff and the Class members' reliance induced them to submit a credit card number that could thereafter be charged without authorization.

65.     Defendants' deception occurred during the marketing and sale of a work-at-home product and therefore occurred in the course of trade and commerce.

66.     Plaintiff and the Class have suffered harm as a proximate result of the Defendants' violations of law and wrongful conduct in the form of actual monetary damages.

67.     Plaintiff and the Class seek an order (1) permanently enjoining Defendants from continuing to engage in unfair and unlawful conduct; (2) requiring Defendants to pay actual, compensatory and punitive damages pursuant to Mo. Ann. Stat. § 407.025; (3) requiring Defendants to make full restitution of all wrongfully obtained funds; and (4) requiring Defendants to pay for damages, and reasonable attorneys fees pursuant to Mo. Ann. Stat. § 407.025.

**COUNT II**
**Fraud in the Inducement**
**(On Behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates by reference the foregoing allegations.

69.     As described with particularity throughout all Counts of this First Amended Complaint, Defendants have disseminated, and continue to disseminate, advertising and transaction pages that they know or should reasonably know are false and misleading. This conduct includes, but it is not limited to, promoting and advertising work-at-home products without disclosing the actual price of the products, a material term of any transaction.

Defendants actively misrepresent and conceal the actual price(s) that consumers are charged when they submit their credit card information.

70. Defendants made common false statements, representations, and material omissions to Plaintiff and the Class including, but not limited to, the actual price of the product, the negative option nature of the charges, the reoccurring nature of the charges, false representations of Defendants' association with Google, including the use of Google's trademarked logo without permission, fake testimonials attesting to the efficacy of the product, fabricated recommendations and reviews through fake news stories and fake blogs, the limited availability of their products in terms of both time to purchase and quantity, the need to "qualify" in order to purchase their product, false statement of earning potential, including variation in amount that can be made in a day ($209-$909, $978, $500, $560 $379, $933), and the false representation that their product is endorsed by television networks, newspapers, or internet websites, including the use of company logos without permission.

71. Through a common series of advertisements, representations and false statements regarding the efficacy, association, and price of work-at-home products, Defendants acted in concert to misrepresent the actual price that Plaintiff and Class members would be charged for the work-at-home product. Intermark facilitated the widespread distribution of work-a-home offers by optimizing, directing and recruiting third party publishers to promote specific Pacific WebWorks landing pages that included deceptive terms. Intermark had knowledge, through its affiliate managers, of the deceptive nature of these work-at-home offers and still sought to actively drive consumers to them for its own monetary gain.

72. Intermark intentionally made all representations of the actual price difficult to locate and/or read by hiding the price representations in its advertising material on a separate

page, or by omitting such representations in their entirety. Further, Intermark and its affiliate marketers helped design Pacific WebWorks landing pages so as to display the price representations far from the payment fields in a miniscule font and in an indistinct color.

73. Pacific WebWorks, in conjunction with Intermark, took concrete and intentional steps to conceal the actual price ultimately placed on the credit cards of members of the Class and SubClass. Pacific WebWorks intentionally made all representations of the actual price difficult to locate and/or read by hiding these representations on a separate page, or displaying these representations far from the payment fields in a miniscule font and in an indistinct color.

74. Pacific WebWorks and Intermark, through a common course of conduct, actively took part in optimizing the work-at-home transaction pages to increase the rate of conversions (sales) and both Defendants have full knowledge and visibility of the website content and transactions, including knowledge of the concealed prices. Intermark pays its affiliate marketers and publishers an amount far exceeding the *de minimis* product price advertised to consumers, and therefore clearly understands that the consumers will in reality be charged an amount well in excess of the advertised price. (For example, Intermark may offer "32.00 / Sale" to an affiliate/publisher who drives traffic to a particular transaction page. That same page, posted for use by Intermark affiliates, will state: "**Cost to Consumer:** $1.97." Intermark is aware that the true cost to a consumer is greater than $1.97 because Intermark is willing to pass through $32.00 from the transaction to its affiliate/publisher.) Thus, Defendants clearly understand that the offer pages they create and post for publishers do not contain a clear and conspicuous disclosure of the actual price a consumer will be charged or, put differently, Defendants know that a consumer will be charged a sum beyond $1.97.

20

75.    Defendants intentionally misrepresented their work-at-home products' association with various media outlets by making representations that the products stem from these media outlets and have been endorsed by television networks.  Intermark knew that Pacific WebWorks and Intermark's own affiliate publishers were actively misusing the media outlets' names and other trademarks to deceive consumers because it takes part in designing the pages, provides advertising materials, and reviews merchant and publisher websites.

76.    In furtherance of their fraudulent conduct, Defendants advertised and promoted their work-at-home products by using the word "free" and other variations of "free" for offers where the actual charges and/or any conditions were not clearly and conspicuously disclosed to the consumer at the time the offer was made.  Intermark, through its affiliate managers, assisted with the design of the landing page, and therefore, knew that Pacific WebWorks was actively misusing the word "free" to deceive consumers.

77.    Defendants additionally promoted their products through a network of publishers operating fake news articles and fake blogs.  These promotions and marketing materials feature widespread use of the term "free" to describe Defendants' product.  Intermark knew, through its affiliate managers, that their affiliate publishers were actively misusing the word "free" to deceive consumers.

78.    By committing the acts alleged in this First Amended Complaint, Defendants have knowingly disseminated untrue and/or misleading statements through fraudulent advertising in order to sell or induce members of the public to purchase work-at-home products.

79.    The price of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product.  Any deception or fraud related to the price of a consumer product is materially misleading.

80.     The misrepresentation of the price of a product is likely to mislead a reasonable consumer who is acting reasonably under the circumstances.

81.     Defendants knew or should have known of the falsity of the representations made regarding the work-at-home products they marketed.

82.     Defendants intended that the deceptive and fraudulent representations would induce a consumer to rely and act based on those false representations.

83.     Plaintiff and the Class members were all charged monies beyond what they authorized.  Accordingly, Plaintiff and Class members have suffered injury in fact and lost money in justifiable reliance on Defendants' misrepresentations of material fact.

84.     Defendants engaged in fraudulent practices designed to mislead and deceive consumers, and did in fact deceive Plaintiff and the Class members, when Defendants created and supported advertising that fails to clearly and conspicuously disclose the actual price of its products, and therein induced Plaintiff and the Class to proffer payment information in reliance on those misrepresentations.

85.     Plaintiff and the Class have suffered harm as a proximate result of Defendants' violations of law and wrongful conduct.

86.     Plaintiff, on his own behalf, and on behalf of the Class and Subclass, seeks damages for Defendants' unlawful conduct.

### COUNT III
### Conspiracy to Commit Fraud in the Inducement
### (On Behalf of Plaintiff and the Intermark SubClass)

87.     Plaintiff incorporates by reference the foregoing allegations.

88.     Defendants acted in concert as business partners and through a common enterprise to drive sales of work-at-home products and cram consumers' credit card bills with

22

unauthorized charges through fraudulent and deceptive marketing, as stated in Count II and throughout this First Amended Complaint.

89.     As a fundamental part of their business relationship, Defendants acted to deceive Plaintiff and the SubClass regarding the actual price of the work-at-home products, thereby inducing consumers to submit their credit card information, on which Pacific WebWorks crammed unauthorized charges. Perpetrating the fraudulent activity described herein requires multiple identical representations from Defendants, each one reinforcing the legitimacy of the deceptive offer; therefore, it is imperative for Pacific WebWorks and Intermark to work cooperatively and with knowledge of each other's marketing methods. Intermark plays the central role in creating a consistent appearance by ensuring that Pacific WebWorks' transaction pages and its affiliate publishers' sponsored links, fake news articles and blogs, all convey the same deceptive marketing message.

90.     Defendants' employees, including affiliate managers and account managers, work in direct contact with each other to create, modify, and propagate deceptive marking materials, websites, and inadequate disclosures. Defendants, through their employees, entered into contracts with the intention to work together to unlawfully enroll Plaintiff and Class members in reoccurring monthly charges without their knowledge or consent. Each Defendant created, maintained or modified marketing materials specifically designed to defraud Plaintiffs and Class members, and each Defendant profited as a result of their joint unlawful acts.

91.     Defendants took overt acts in furtherance of their conspiracy across the nation, and specifically took overt acts in furtherance of their conspiracy within Missouri. As described with particularity above, Defendants formed contracts with each other, created deceptive marketing, advertisements, websites, and other solicitation materials to drive consumers to the

work-at-home transaction page with knowledge that the marketing contained therein was false and misleading, and with the intent that the marketing taken as a whole would be relied on by consumers. Defendants further partnered with affiliate marketers and publishers to increase the effectiveness of their deceptive and fraudulent marketing. Defendants, working together and with non-defendant affiliate marketers and publishers, formed a mutually beneficial network of deceptive and misleading marketing designed to induce consumers to submit a credit card number for the purchase of a work-at-home product.

92.     Defendants made common false statements, representations, and material omissions to Plaintiff and the SubClass, including but not limited to, the actual price of the product, the negative option nature of the charges, the reoccurring nature of the charges, false representations of Defendants' association with Google, including the use of Google's trademarked logo without permission, fake testimonials attesting to the efficacy of the product, fabricated recommendations and reviews through fake news stories and fake blogs, the limited availability of their products in terms of both time to purchase and quantity, the need to "qualify" in order to purchase their product, false statement of earning potential, including variation in amount that can be made in a day ($209-$909, $978, $500, $560 $379, $933), and the false representation that their product is endorsed by television networks, newspapers, or internet websites, including the use of company logos without permission.

93.     Any single Defendant, acting alone, would be unable to accomplish the level of deception and misrepresentations accomplished by the Defendants acting together. Their joint deception reinforces the appearance of legitimacy presented to consumers, thereby increasing the likelihood that a consumer will submit her credit card number. Pacific WebWorks would not have the widespread reach to consumers across a wide variety of websites and would be unable

Case 4:10-cv-00875-HFS   Document 13   Filed 10/06/10   Page 24 of 39

to enroll customers with the same effectiveness without the direct involvement, assistance, and direction of Intermark.

94.     Plaintiff and the SubClass have suffered harm in the form of monetary damages as a proximate result of the conspiracy and violations of law carried out by Defendants.

95.     Plaintiff, on his own behalf and on behalf of the SubClass, seeks damages for Defendants' unlawful conduct.

**COUNT IV**
**Breach of Contract**
**(On Behalf of Plaintiff and the Pacific WebWorks Class)**

96.     Plaintiff incorporates by reference the foregoing allegations.

97.     In reliance upon Defendants' common misrepresentations and deceptive advertising, Plaintiff entered into a contract to receive a product from Pacific WebWorks at a genuinely discounted price, or for the cost of shipping and handling only. Because of these deceptive misrepresentations, Plaintiff and the Pacific WebWorks Class entered their credit card information with the understanding that they would only be charged a genuinely discounted price or the cost of shipping and handling in exchange for a product from Pacific WebWorks.

98.     By cramming additional undisclosed charges on the credit/debit cards of Plaintiff and the Pacific WebWorks Class members, Pacific WebWorks breached the contract for the purchase of a product at the clearly disclosed price described above. Plaintiff and Pacific WebWorks Class members did not assent to any additional charges and did not reasonably expect that the contract for purchase and sale would include such additional charges.

99.     At all times relevant to this action, Pacific WebWorks acted willfully and with the intent to breach the contracts they entered into with Plaintiff and the Pacific WebWorks Class members because it intentionally failed to disclose the actual price Plaintiff and Class members would be charged.

25

100.     Plaintiff and the Pacific WebWorks Class have suffered damages as a di ect result of Pacific WebWorks' acts and practices in the form of monies paid and lost.

101.     Plaintiff, on his own behalf and on behalf of the Pacific WebWorks Clas ;, seeks damages for Pacific WebWorks' breach of contract, as well as interest and attorney's fe es and costs.

## COUNT V
**Restitution/Unjust Enrichment (*in the alternative to Breach of Contract*)**
**(On Behalf of Plaintiff and the Pacific WebWorks Class)**

102.     Plaintiff incorporates by reference the foregoing allegations, with the exc lusion of paragraphs 96-101.

103.     Plaintiff and members of the Class conferred a monetary benefit on Paci ic WebWorks. Pacific WebWorks has received and retained money belonging to Plaintifl and the Class members via Pacific WebWorks' substantial and unauthorized charges to Plaintif `and the Class members' credit cards. Pacific WebWorks profits from each individual purchase made by a consumer after being directed to Pacific WebWorks' transaction pages.

104.     Pacific WebWorks appreciates or has knowledge of such benefit.

105.     Under principles of equity and good conscience, Pacific WebWorks sho ild not be permitted to retain the money belonging to Plaintiff and members of the Class, which P icific WebWorks has unjustly received as a result of its unlawful actions.

106.     Plaintiff and other members of the Class suffered actual damages as a di ect result of Pacific WebWorks' conduct in the form of charges to credit cards above and beyond the limited amount authorized by Plaintiff and the Class members.

107.     Plaintiff, on his own behalf and on behalf of the Class, seeks restitution : or Pacific WebWorks' unlawful conduct.

## COUNT VI
### Restitution/Unjust Enrichment
### (On behalf of the Plaintiff and the Intermark SubClass)

108.     Plaintiff incorporates by reference the foregoing allegations.

109.     Plaintiff and members of the SubClass conferred a monetary benefit on ntermark. Intermark has received and retained money belonging to Plaintiff and the SubClass resulting from substantial and unauthorized charges placed on their credit card bills by Pacific WebWorks. Intermark profits from each individual purchase after Intermark directs a consumer to a Pacific WebWorks transaction page.

110.     Intermark appreciates or has knowledge of such benefit.

111.     Under principles of equity and good conscience, Intermark should not be permitted to retain the money belonging to Plaintiff and members of the SubClass, whi :h Intermark has unjustly received as a result of its unlawful actions.

112.     Plaintiff and other members of the SubClass suffered damages as a direct result of Intermark's conduct.

113.     Plaintiff, on his own behalf, and on behalf of the SubClass, seeks restitution for Intermark's unlawful conduct.

**WHEREFORE**, Plaintiff Thomas Aikens, on behalf of himself and members of the Class and SubClass, pray for the following relief:

a.       Certify this case as a class action on behalf of the Class and SubClass as defined above and appoint Thomas Aikens as class representative and undersigned counsel as lead counsel of this class action;

b.     Enter judgment against Pacific WebWorks, Inc. and Intermark Communications, Inc., for all monetary, actual, consequential, and compensatory damages caused by its unlawful conduct;

c.     Award Plaintiff and the Class civil penalties and/or punitive damages for willful violations of the above-cited statutes and law;

d.     Award Plaintiff and the Class reasonable costs and attorneys' fees;

e.     Award Plaintiff and the Class pre- and post-judgment interest;

f.     Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and,

g.     Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: October 6, 2010

By:       /s/ William G. Crowe

William G. Crowe (#46416)

One of the Attorneys for Plaintiff,
individually and on behalf of a class of
similarly situated individuals

William G. Crowe (#46416)
Law Offices of Bill Crowe, MBA, JD, LC
3259 East Sunshine, Suite I
Springfield, MO 65804-2143
417 883-8000 fax 888 335-4611
Wcrowe1415@gmail.com

28

# EXHIBIT A

Case 4:10-cv-00875-HFS   Document 13   Filed 10/06/10   Page 29 of 39

# San Diego
# HERALD NEWS

**Online Cash Success Kit**
Work From Home On Your Computer ...

ADVERTISEMENT

## Jobs: Is Working Online At Home The Next Gold Rush?

Posted by Anthony on Sunday, 08/16/2009 and filed under Finance. You can follow any responses to this entry through the RSS 2.0. You can leave a response or trackback from this entry from your site

AS SEEN ON:  abc CBS CNN NBC USA TODAY



Many sites showcase people making as much as $300 a day working online from home on their computer.

Are online jobs the next big thing? For Mary Steadman it sure is. Mary, an Account Rep laid off from a large Manufacturing company, is thriving in the midst of an economic recession all the while working in the comfort of her own home.

*From her website:* "I make about $21 for every link I post on the Internet, sometimes $23.50. I get paid every week, and my current income is around $9,875 a month."

Mary's story is one we hear all too often these days. Working as an account rep for a large manufacturing company she was laid off from her job. A few days later her husband was also laid off from his company as well as part of the continuing cutbacks in this terrible economy.

"We knew we had to do something and do something fast. Our house payments weren't going to pay themselves. We put our heads together and started trying different online job opportunities. May and her husband David wound up getting sucked into a couple get rich quick 'business opportunities' that turned out to be nothing more than scams before they found something that really worked.

"I realized the best thing to do is instead of hoping that a company that you are looking at is going last, why not go with a big, reputable company. After looking at several different companies, I picked the safest bet... Google!"

Online giant Google is a publicly traded company and is currently worth $132.5 Billion (Yes thats Billions with a B). The company has pioneered online search and has changed the way we use the internet.

In a matter of weeks Mary and David had a steady stream of income coming in via checks that were delivered right to their home. They happened upon a system called "**Online Cash Success Kit**." This showed them how to make money posting online links.

*Online Cash Success Kit is an online course that can teach anyone, regardless of computer skill level to start making money online.*

"We were doing ok but then we discovered the real trick to making money. We combined the Google Kit with two other online courses called "**Google Home Income**" and "**Google Click Money**." Thats where we really learned the extra tricks that the pros know. After combining the three courses things really took off for us; instead of making a couple of hundred bucks here and there, our incomes skyrocketed."

Mary even shared with us a picture of the kind of checks she now gets every month:



For those of you that have seen the 'scammy' sites on the internet that promise you can make millions of dollars online. Mary warns that this is not the promise being made here and that most of those sites are



Mary Steadman lost her "boring" job as an account rep for a manufacturing company a few months ago. She now makes $5500+ a month working from home on the Internet. Read her story to learn how she did it and how you can do the same.

**Step 1:**
Fill out form of **Online Cash Success Kit**

**Step 2:**
Get **Google Home Income** (This is key. Must do this!)

**Step 3:**
BONUS STEP: **Google Click Money** (Only for those who need significant income)

**Step 4:**
Post the Links given to you, and then just deposit the checks mailed to you!

**How To Beat The Recession: Work At Home**
Google bails out US tax payers with $9/hour jobs
**Read Here >>**

**I Make $5000 A Month**
Posting Links Online
After Getting Fired I Found A Home Job Making $5k A Month!
**Read Here >>**

**Work At Home - $7/Hour**
Easy Work From Home
System. Risk Free
**Read Here >>**

**I'm Rich You're Not...**
I Made Tons Of Cash
Online . Pretty Easy
**Read Here >>**

**I Make $173 A Day**
Posting Links Online
How I went for rags to riches working from home.
**Read Here >>**

WEATHER
San Diego, CA
Sunny 13°F

TAGS
**Make Money Online**
Recession  Make Money On Google
Online Marketing  **Extra Money**
Adwords  Google  Part Time Jobs
Online  Work At Home  Bailout
Telecommute  Easy Cash Fast  **How To Pay Off Debt**  How To Find A Job  Yahoo  Search Jobs  Monster Jobs



abc CNN USA TODAY
Step 1: Enroll
Step 2: Get PAID!
REGISTER FREE
CLICK HERE



WHAT RECESSION?
work at home

Jobs: The Economy
"Jobs are not going to be
found as fast as we'd like..."

New York
# FINANCE NEWS

Google Profi  Club
"Work From H  me On Your
Computer..."

## "How A Stay At Home Mom Makes $6500/ Month On Google"

Posted by *Anthony* on Thursday, May 21 2009 and filed under Finance. You can follow any responses to this entry through the RSS 2.0. You can leave a response or trackback to this entry from your site

AS SEEN ON: abc  AOL  CNN  MSNBC  USA TODAY



Many sites showcase people making as much as **$300 a day** working online from home on their computer.

Are online jobs the next big thing? For Mary Steadman it sure is. Mary, a mother from San Jose, CA is thriving, in the middle of an economic recession working in the comfort of her own home.

*From her website:* "I get paid about $25 for every link I post on Google and I get paid every week... I make around $6,500 a month right now"

Mary's story is a very familiar one in these tough times. She lost her job as an account rep for a manufacturing company and a few days later her husband also was laid off from his job as part of cutbacks due to the bad economy.

"We knew we had to do something, so we put our heads together and started trying online job opporunities." Mary and her husband Kevin wound up getting caught up in a few quick rich business opportunities that were nothing more than pyramid schemes before finding something that really worked.

"I realized the best thing to do is instead of hoping that a company that you are looking at is going last, why not go with a big, reputable company. After looking at several different companies, I picked the safest bet... Google."

Online giant Google is a public company and is worth an estimated $10



Mary Steadman lost her "boring" job as an account rep for a manufacturing company a few months ago. She now makes $6,500+ a month by just submitting small texts and links online on Twitter. Read her story to learn how she did it and how you can do the same.

**Step 1:**
Get **Google Profits**

Step 2:

ADVERTISEMENTS

**How To Bea    The
Recession:    Work At Home**
Google bail  out US tax-
payers with  i97/hour jobs.
Read More  :>

**I Make $50  0 A Month
Posting Lin  s Online**
After Gettin  Fired I Found
A Home Jot  Making $5k
A Month!
Read More  :>

**Work At Ho   ne $87/Hour**
Easy Work  rom Home
System. Ris  t Free
Read More  :>

**I'm Rich Yo   re Not...**
I Made Tons  Of Cash
Online... Pr  ty Easy
Read More  :>

**I Make $17   A Day
Posting Lin  s Online**
How I went  om rags
to riches wi  king/home.
Read More  :>



## Today: How Local "Computer Novice" Dad Makes $10,000/mo Online From Home

As part of our ongoing series: "Jobs and the Recession: What you need to know" we explore an industry that, despite the recession, seems to be booming

By Mary Waters
Published: September 1st, 2009
**Office Location: Miami, FL.**

2868 diggs

Working from home, no selling, no commute, 6 figures a year, dream lifestyle – sounds more like a dream than reality to most, but is working online the next big thing?

For Frank Goldman it sure is. Frank, a father from Miami, FL is thriving in the online industry, where now over 1 Million Americans derive over 80 percent of their income. But can anyone make money online?

*From his website:* "I get paid about $25 for every link I post on blogs and I get paid every week... I now make around $10,000 a month. Anyone can do this."

Frank uses Home Based Biz, a program that teaches anyone how to start making money online. Here are the steps to get started:

**Step 1.** Get Home Based Biz, only pay the $9.95 for shipping.
**Step 2.** Setup your account and post the links given to you by email every morning.
**Step 3.** Cash your weekly checks.

**Frank's Story**

Frank lost his job as an account rep for a manufacturing company and a few days later his wife also was laid off from her job as part of cutbacks due to the recession.

"We knew we had to do something, so we put our heads together and started trying online job opportunities." Frank and his wife Catherine wound up getting caught up in a few quick rich business

Frank Goldman lost his "boring" job as an account rep for a manufacturing company a few months ago. He now makes $10,000+ a month by just posting links on blogs. Read his story in our feature to learn how he did it and how you might consider doing the same.

**Step 1:**
Get Home Based Biz

**Step 2:**
Post links given to you.

**Step 3:** Cash your weekly checks.

**Inside Look - How L...**
★★★★★

**Most Popular**

**COPS: Robbery Suspect Linked to Carjacking**
*UDPATE:* a 17-year-old accused of holding up a Harrison Township bank and placing a gun to a customer's head may also be responsible for carjacking a young man missing since Sunday night.
**INSIDE: Watch Team 7 Coverage**
Watch Video

**5 DPS Employees Charged in Criminal Probe**
Five Detroit Public Schools employees have been charged with embezzlement in an ongoing probe into the "culture of corruption" that took hold in the state's largest district, a prosecutor said Wednesday.
**INSIDE: What They're Accused of Doing**



**National Consumer Advocacy Group**

Home
File A Complaint
Contact Our Staff
Approved Credit Repair
Credit Repair Scams
Approved MLM
MLM Scams
Approved Work At Home
Work At Home Scams

## APPROVED WORK AT HOME OPPORTUNITIES

Below are the best work at home opportunities we have found. Based on consumer feedback as well as our own investigations (including searching all business bureau databases) we have compiled a list of the best work at home opportunities. Next to each entry is our composite rating, on a scale of 0 to 100. Returns listed are averages based on our research. Some will make more, others less. **Simply click on each company's name to be transported to their website.**

### 3 Best Work At Home Opportunities

Name: **Google StartUp**
Rating: **98**
Average Investment: **$50**
Average Yearly Return: **$80,000+**
Summary: Google StartUp will teach you everything you need to know to start your own online business. Adwords account creation and campaign management are explained in great details. Google StartUp teaches you how to boost traffic to any website. Language is comprehensive and beginners report to have learned a lot about professional web marketing and put this knowledge into practice. Lots of software and tools are included in the disc - satisfying the needs of both beginners and more advanced users.

Name: **Google Home Business**
Rating: **97**
Average Investment: **$29**
Average Yearly Return: **$42,000**
Summary: Google Home Business is an easy to start online business kit. It guides you through the basics of setting up your own online business with Google and explains you the most important things you need to know if you want to build up a successful work at home enterprise. A lot of people report that this kit was the key to their financial success. No profound computor knowledge is required to start and if you follow strictly all the steps in this program there's virtually no chance of failure. The Google Home Business' team offers different promotions on regular basis and free trials are often available.

Name: **Ebay Success System**
Rating: **94**
Average Investment: **$48**
Average Yearly Return: **$35,000**
Summary: This kit teaches people how to achieve financial stability by working at home for the Ebay. There are lots of courses on that matter but Ebay Success System is reported to be the most comprehensive guide out there. It's easy to use even for beginners. Promotions are always available.

Questions? Comments? Email Us At: info@ncaggroups.com

# EXHIBIT B





# EXHIBIT C



